UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATE OF AMERICA, | Crim. No. 23-3679(5) (JMB) |
| Plaintiff, | |
| v. | **DEFENDANT PHYU JAME'S SENTENCING POSITION PAPER** |
| PHYU WIN JAME, | |
| Defendant. | |

Phyu Jame stands before this Court not as the sum of her worst decision, but as a woman who has fought to reclaim her life. She is a first-time offender who accepted responsibility early, cooperated with the government, and then focused on the hard work of change—completing intensive treatment, embracing a faith perspective, and strengthening her role as a devoted mother. Her story is one of resilience: from a childhood marked by displacement and hardship to a present defined by accountability and hope.

The advisory guideline range is only a starting point. Section 3553(a) directs the Court to impose a sentence that is "sufficient, but not greater than necessary." For Ms. Jame, that means a sentence that recognizes her progress, preserves her family stability, and allows her to continue the rehabilitation she has already begun.

**I.      Sentencing Guidelines Are Not Mandatory.**

The parties do not dispute that Ms. Jame's advisory guideline range is 87–108 months (Offense Level 29, Criminal History Category I). But this range is only the starting point of sentencing considerations.

In *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586 (2007), the United States Supreme Court clarified the two-step process to be followed in federal sentencing. The sentencing judge must first determine the guidelines range applicable to the defendant. *Id.* at 596. Then, the court must consider the factors in 18 U.S.C. § 3553(a) and determine whether a departure or a variance is appropriate. *Gall*, 128 S.Ct. at 596-97; *United States v. Pepper*, 562 U.S. 476, 131 S.Ct. 1229, 1241 (2011); *United States v. Roberson*, 517 F.3d 990, 993 (8th Cir. 2008). In so doing, the Court is "to make an individualized assessment based on the facts presented" and must impose a sentence that is sufficient but not greater than necessary to accomplish the many goals of federal sentencing. *Id.*

In considering the appropriate sentence, this Court is guided by the broad framework set forth in § 3553(a), which suggests a number of factors relevant to sentencing. These factors are designed to ensure that sentencing decisions are tailored to individual circumstances and the broader aims of justice. Specifically, the Court must evaluate: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the need to afford adequate deterrence to criminal conduct; (4) the need to protect the public from further crimes of the defendant; (5) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (6) the kinds of sentences available; (7) the Sentencing Guidelines and related policy statements; (8) the need to avoid unwarranted sentence disparities among defendants with similar records; and (9) the need for restitution to any victims of the offense.

Each of these factors must be weighed in light of Ms. Jame's personal journey and demonstrated commitment to change. The record in this case reflects her rehabilitation, support network, and the positive steps she has taken, which bear directly on the "history and characteristics" factor and the broader purposes of sentencing.

## II.     History and Characteristics of the Defendant (§ 3553(a)(1))

### A.     Ms. Jame has a Unique Family History and Cultural Background.

Ms. Jame's life has been shaped by resilience—her own and her ancestors. Born to Karen parents who fled persecution and lived in a refugee camp, she grew up learning to shoulder responsibility early and to rely on family and faith communities for support. Those same supports remain present today. Her relatives and close friends continue to encourage the law-abiding, service-oriented path she has chosen over the last several years.

The Karen are one of Myanmar's largest ethnic minorities, living mainly along the country's southeastern frontier and in parts of the Irrawaddy Delta; they encompass multiple linguistic and religious communities, with Sgaw and Pwo Karen as the most widely spoken languages. Tensions between Karen communities and the central state pre-date independence and were exacerbated in the late-colonial period, when British policies of "direct and indirect rule" and the wartime/colonial recruitment of ethnic minorities into security roles deepened mistrust with the Burman/Bamar majority.[1]

---

[1] See The Border Consortium, *Camps in Thailand*, https://www.theborderconsortium.org/where-we-work/camps-in-thailand/; Karen Organization of Minnesota, Kern History, https://mnkaren.org/history-culture/karen -history/.

After independence in 1948, the Karen National Union (KNU) emerged as the main political vehicle for autonomy or self-determination; its armed wing, the Karen National Liberation Army (KNLA), began an insurgency in 1949, making the Karen conflict one of the world's longest-running civil wars.  Decades of counter-insurgency by the Myanmar military (Tatmadaw)—marked by village relocations, forced labor, and scorched-earth tactics—have displaced hundreds of thousands of civilians and repeatedly pushed Karen families into Thailand.[2]

Cross-border refuge accelerated when the Tatmadaw shifted operations in 1984 from hit-and-run raids to "attack-and-hold" sweeps in Karen State; that change produced the first organized Karen refugee camps on the Thai side of the border (*e.g.*, Mae La/Beh Klaw) as villages, KNU/KNLA support bases, and even opposition headquarters were overrun.[3]  Subsequent military offensives and strategic losses—most notably the fall of Manerplaw on January 27, 1995—triggered new waves of flight.  In the late 1990s, intensified campaigns and cross-border attacks on camps by forces aligned with the junta (such as the DKBA) kept displacement high and underscored the insecurity civilians and former combatants faced if they remained in Myanmar.  In this context, many Karen *"freedom fighters" (a KNLA member or supporter) came to Thai refugee camps by (1)*

---

[2] See U.N. High Comm'r for Refugees *(UNHCR),* Thailand, https://www.unhcr.org/where-we-work/countries/thailand; see also Karen Women's Organisation, *Background of the Karen People*, https://karenwomen.org/background-of-the-karen-people/.

[3] See EBSCO Research Starters, *Karen Refugee Crisis*, https://www.ebsco.com/research-starters/history/karen-refugee-crisis.

retreating after a base or village fell, (2) crossing the Salween River to shield family from reprisals or forced portering, and (3) seeking temporary protection in Thailand while the conflict persisted. These camps—established from 1984 onward—became the *de facto* sanctuary for mixed flows of civilians and ex-combatants awaiting longer-term solutions.[4]

Ms. Jame's parents experienced significant trauma due to fleeing from Burma, the experience in the refugee camps, and adjustment to life in America. They resorted to alcohol and substance use to cope with that trauma. The ways in which her parents mental, physical and behavioral health issues affected Ms. Jame are documented in the Presentence Investigation Report submitted to this Court on May 22, 2025 [Doc. No. 439]. Ms. Jame now suffers from some of the same issues, but she refuses to be caught in the cycle of family trauma and strives every day to break the cycle, so that she can provide better care to her own children.

**B.   Faith is Important to Ms. Jame.**

In November 2023, Ms. Jame made a commitment to God, culminating in her baptism at Emmanuel Christian Center in Spring Lake Park. Since then, her faith has aided her on her journey to recover from the grip of substance abuse. While she has not always maintained regular church involvement, she has pursued spiritual mentorship throughout the recovery process and surrounded herself with positive influences. That commitment is not symbolic; it aligns with the practical steps she has taken—growth, service to others, and efforts to adhere to supervision—demonstrating genuine rehabilitation.

---

[4] *Id.*



Certificate of Water Baptism (Nov. 19, 2023), Emmanuel Christian Center.

### C. Ms. Jame is Dedicated to Recovery, Despite Setbacks.

Ms. Jame completed residential treatment at ANEW from December 30, 2024 to March 31, 2025. Her counselor, Alicia McCabe, states:

> Phyu Jame was admitted to ANEW's High Intensity Residential Program on December 20th, 2024. She was an active participant in her residential treatment process and community. Ms. Jame was active in addressing her addictive thinking patterns, building self-worth, and creating healthy routines of self-care and healthy coping skills. Ms. Jame participated in Moral Reconation Therapy programming and completed steps 1-6. She worked to address childhood traumas and explore what had led her to use substances to cope. Ms. Jame completed residential programming on March 31st, 2025, with staff approval and transitioned to our intensive outpatient program and sober housing.

6



Certificate of Graduation from ANEW Residential Treatment Program (Dec. 30, 2024 – Mar. 31, 2025)

Ms. Jame continued in ANEW's outpatient program from April 1, 2025, through May 8, 2025. During that time, Ms. James experienced the birth of her son, Jayce. This forced her into increased proximity with Jayce's father, who has more severe substance abuse challenges than Ms. Jame and tends to act as an albatross to her continuing recovery. Ms. Jame stumbled on her recovery path and continued her recovery journey at Recovering Hope, where she could have her infant son at her side. Her treating clinician reports that she has shown continued growth and dedication to herself and her children—engaging in treatment, therapy, and serious efforts to adjust her support system. Ms. Jame completed Primary Treatment at Recovering Hope on July 22, 2025, and is now successfully residing in a halfway house while receiving outpatient treatment.



Certificate of Graduation from Recovering Hope's Primary Treatment Program (July 22, 2025)

### D. Parenting and Responsibilities to Her Children

Ms. Jame's foremost priority is her children, Jewel and Jayce. She ensures school attendance, healthcare appointments, and consistent routines, with help from extended family. She has lined up childcare during any period of custody. According to long-time friend, Vanessa Mack, Ms. Jame is:

> an amazing mother to her 2 children, Jewel and Jayce. She is both of their main providers and Jayce, being so little, is still very dependent on her. She teaches Jewel sign language and does extra-curricular activities with her and now she surpasses all the kids in her classes! Jewel is so smart and respectful at her young age, and I give that credit to Phyu.

8



Photo of Ms. Jame and Jewel at Emmanuel Christian Center's Christmas service (Spring Lake Park).

While Ms. Jame has a good relationship with her sister, Jenny, who resides in Minnesota, Jenny has several children of her own and is unable to act as a custodian for either of her children. Ms. Jame is working on a plan for custody in the case of her incarceration for the offense at issue here, but her absence from her children's lives for any significant period of time will result in instability and deleterious effects on their mental and behavioral health. Attachment theory and empirical evidence teach us that losing a parent—whether through death or prolonged separation—during early childhood is a potent form of stress that can disrupt the foundation of neurophysiological, emotional,

social, and cognitive functioning. These disruptions can impair the child's ability to form secure relationships later in life and increase vulnerability to mental and behavioral health disorders.[5]

Despite her recent struggles, Ms. Jame was very happy to welcome her son, Jayce, into the world this year.  Baby Jayce is currently thriving in his mother's care.  Jewel is aware that her mother may be going away from her for a period of time and is experiencing anxiety over this looming threat to the current happiness and stability of the family unit.



Photo of Ms. Jame with her newborn son, Jayce, and her daughter, Jewel, in the hospital.

---

[5] See A. Chu & A.F. Lieberman, *Losing a parent in early childhood: The impact of disrupted attachment,* pp. 261–267, R. A. Thompson et al. (Eds.), Guilford Press (2021).

Counsel researched whether the federal prison system has programs where an incarcerated mother her children can remain in proximity. There are two programs that apply to women who are pregnant at the time they are incarcerated: Mothers and Infants Nurturing Together (MINT) and the Residential Parenting Program (RPP). Unfortunately, there are no programs that allow mothers who have given birth within the year before incarceration the opportunity to have contact with their children.

### E.    Service to the Community

Each holiday season since 2019, Ms. Jame has partnered with friends to prepare and distribute meals and supplies at church-sponsored events and in the broader community. These efforts have not been one-off gestures but repeated, hands-on service—collecting donations, shopping, cooking, packaging, and delivering food and other necessary supplies with care and dignity. Ms. Jame works with friends like Nessa Carter, who shares Ms. Jame's passion for helping and serving those in need. Ms. Jame and her friends plan, organize, and execute these efforts themselves, not through any pre-organized program like Wheels on Meals. They do it with no expectation of receiving anything in return except the joy and satisfaction that comes from expressions of charity and service.



Photo of Ms. Jame (far left) volunteering with family and friends at a Christmas outreach event.



Ms. Jame's social media post organizing a Thanksgiving meal collection for the homeless.



Thanksgiving meal trays prepared by Ms. Jame and a friend for distribution to those in need.

Ms. Jame's favorite time to volunteer is around the Thanksgiving holiday. She and Nessa cannot tolerate the thought of members of the community going hungry while others are feasting like kings. They work all day and into the evening to ensure delicious meals are delivered to various shelters and churches.



Photo of Ms. Jame delivering meals and supplies to individuals experiencing homelessness.

### F.  Ms. Jame Has the Support of Her Community.

The Court will also receive sincere letters attesting to Ms. Jame's character, caregiving, and sustained efforts at rehabilitation. A long-time friend describes Ms. Jame as "caring and loving," recounting years of hands-on service—including holiday meal distributions since 2019—and steady parenting that has helped her daughter thrive.

A treating clinician reports that Ms. Jame completed residential treatment, engaged in MRT addressed trauma, accepted a higher level of care when needed, and has shown continued growth and commitment to her children since discharge. Though Ms. Jame has struggled with mental and behavioral health issues, including substance abuse, she has also showed a continuing commitment to become healthy for herself and for her growing family.

14

### III. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

When a man she barely knew approached her and offered her hundreds of dollars to fly to Arizona and help package boxes, Ms. Jame knew there were illegal drugs involved. That is why she has cooperated, pleaded guilty and fully accepted responsibility for her role in this offense. But it is not the whole story. Ms. Jame did not have a job at the time. She was trying to support Jewel, and she had a very sick family pet that needed medical care. To be frank, she was feeling desperate.

Ms. Jame was not aware of the type or amount of drug involved. She was not involved in planning, communication with drug cartels, or organizing. The government's position is that anyone who flew to Arizona as part of this conspiracy is an average participant. Ms. Jame asks the Court to take into consideration the circumstances of her commission of the offense—something entirely out of character for her—and vary downward due to the limited nature of her role in, and knowledge of, this conspiracy.

### C. OTHER SENTENCING FACTORS

Pursuant to 18 U.S.C. § 3553(a)(2), the sentence imposed needs to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and to protect the public from further criminal conduct of the defendant. While participation in a drug conspiracy is serious, Ms. Jame submits that she does not need a lengthy prison sentence to learn her lesson. Separation from her children for any length of time and other consequences specific to Ms. Jame, which are explained elsewhere in the record, will be more than sufficient punishment.

Months in residential treatment programs and halfway houses has afforded Ms. Jame the time to reflect on her choices and put her on the right path. According to statistics published by the Sentencing Commission, Ms. Jame is highly unlikely to recidivate: her anomalous career with drug trafficking conspiracies consisted of one trip to Arizona, influenced by desperation and situational poor judgment. Offenders with zero criminal history points are least likely to reoffend after conviction, women are significantly less likely to recidivate than men, and Ms. Jame is approaching the age where youthful recidivism rates have abated.[6] A lengthy prison term would completely destabilize Ms. Jame's life, and the life of her children, and work against the purposes of sentencing. Ms. Jame respectfully asks the Court to impose the lowest sentence it deems necessary to address the purposes of sentencing in the federal system.

Dated:  August 20, 2025

//Lousene M. Hoppe
Lousene M. Hoppe (#0387171)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street
Suite 1500
Minneapolis, MN  55402-4400
Minneapolis, MN  55402-4400
(612) 492-7000
lhoppe@fredlaw.com

***Attorneys for Plaintiff/Defendant***

---

[6] United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, https://www.ussc.gov/research/reasearch-reports/recidivism-among-federal-offenders-comprehensive-overview.